So we'll hear argument now in 2011-95 Netsoc against Match Group, 2014-30 Netsoc against Quora, and 2014-31 Netsoc against both. Now, Mr. Ramey. My apologies, Judge Toronto. I was eager to get started, but I'll start again. Good morning, Judge Toronto, Judge Chin, and Judge Stoll. My name is Bill Ramey, and I represent Netsoc, LLC. If it pleases the court, may I begin? Yes, please. The claims of the 107 patent and the claims of the 591 patent are directed to the specific technological improvements of creating improved social networks with novel rating systems. The claims of both patents do not foreclose the creation of all social networks, but rather only those improved social networks with the particular claimed rating systems. In short, the claims of both patents claim a specific system for and method of establishing the social network with novel rating systems. Following this court's guidance in cases like Packet Intelligence v. Netscout and SRI International v. Cisco Systems, the claims in the 107 patent and the claims in the 591 patent do not use a computer as merely a tool to create a social network. Rather, the claims of the patents are limited to the specific technological improvements or techniques of applying rating systems in establishing a social network on a computer system. Stated in another way, the claims specifically claim, one, an underlying computing technology or platform, two, an improvement to that underlying technology, that being associating the participants with an updated rating, and three, a specific claim rating system, i.e., how that rating system is determined. For the 107 patent, the rating is determined at least in part based on tracked response time. For the 591 patent, the rating is based on user feedback of the published portion of the participant response, and that's important to remember that the user is doing the ranking in the 591 patent. So these novel rating systems give the claims what this court has referred to as the concreteness necessary to transform what otherwise might be considered abstract ideas into something concrete and therefore patent eligible. The claims of the 107 patent and the claims of the 591 patent have the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it. The claim is defined in a concrete manner and improves social network with novel rating systems. Here, in a broad sense, users and participants are matched based on category selections. However, then the claim rules of the patents provide the specificity to make the inventions concrete. The rating systems operate to control the display of participant matches to the users. But the 107 patent and the 591 patent claims are patentable for another reason. A social network is something concrete, something real, and not abstract in the slightest. A social network has a very particular meaning in the art field and is commonly understood as a website that brings people together to talk, share ideas, and interest or make new friends. This type of collaboration sharing is known as social media. And unlike traditional media, it can have thousands or even millions of inputs into it. We provided in our briefing a non-exhaustive list of examples of social media websites and basically social networking websites. It's important to note that in the briefing that we provided in our motion for a new trial in the 1195 district court appeal, and in our supplemental briefing in both the 1430 and 1437 appeals, the declaration of Dan Shapiro where he commented on the state of the art in 2003, that being the date of invention for these patents, that he put forward that social media was in its infancy at that time. In fact, there's the document that's put forward in the 1195 appeal, appendix page 0070, is a timeline of how social media and how social networking sites grew. And in 2003, there weren't hardly any around. We had 1996 was the launch of Friendster, 98, pardon me. And then in 2003 came LinkedIn, 2004 Facebook. So it's hard to say that in 2003, when this invention was created by the inventor, Ms. Emily White, that social media sites or social networking sites were commonplace or conventional. They just weren't. They were something new and something that are concrete and defined on their own or patentable subject matter. So I've talked a little bit to this panel about the radio industry. Mr. Ramey, this is Judge Chen. I'd just like to ask a quick question here. Yes, your honor. It's a hypothetical. Imagine that I have a business and my business is trying to help customers find good real estate agents, good home renovation contractors, et cetera. And I have a little office and customers come into my office and say, I need help trying to find a house in a particular neighborhood. And I also need to find painters and people that can do, you know, refinish floors and stuff like that. And then I have a bunch of three ring binders in my office. And I say, oh, OK, you want to live in Arlington, Virginia. Well, let me go to my binder. And I know a lot of great real estate agents in Arlington, Virginia. And what I'm going to do is I'm going to contact some of those agents and give them your phone number. And then they will call you and contact you. And then you'll get to choose which one of those agents you want to work with to try to find a house in Arlington. Judge Chen, do you want to continue with your hypothetical? OK. Hello, Mr. Remy, can you hear me? Yes, Your Honor. Thank you. OK. Yes. I was in the middle of a long winded hypothetical and I apologize for eating up your time. But very quickly to start over. I'm talking about a hypothetical of where I have my own business with an office and customers come in and they're looking for relocation services. And they're looking for people like real estate agents and home renovation contractors. And they come to me and then I have a bunch of three ring binders that have preferred agents and contractors. And then through looking through my binders, I find the phone numbers of what I think are really good agents and really good home contractors. And I contact those people to give a phone call to my customer. And then based on how quickly they call the customer, I will assign a rating to those agents and contractors. Would you say that that's a patent eligible invention? Yes, Your Honor. Thank you for the question. I think that that, if you remember earlier in my argument, that actually reads out some of the limitations from what we've done. So if you're trying to compare apples to apples, I think this example may compare apples to oranges. The paper and pencil method is not a social network. It's creating a social network of that one person. I'm sorry, but before you go any further, just so I get an answer to my question, would you agree with me that what I just described is not a patent eligible invention? I understand it doesn't have all the limitations of your claims, so maybe it's not apples to apples, but I'm just trying to figure out a baseline of whether you and I agree that what I described is not a patent eligible invention. Yes, sir. So what you described was, I'm walking it through a little bit. So is that something, I would say that that would be difficult to obtain patentability. It would depend on the limitations and the granularity that a clever patent attorney put on the claims with the hypothetical that you put forward, Judge Chen. Yeah, my hypothetical has nothing more and nothing less in terms of what is recited in the claim. Is that patent eligible? That would be a very difficult patent. I think it would not be patent eligible as you presented it, sir. Okay. Now I'd love to hear what's extra about your claim. Yes, Your Honor. So what you presented was a paper and pencil methodology for approaching a social network. That's not a social network. That's not what we defined as a social network. It's not what the art field defines or understands to be a social network. What you have is a binder with pencils with the individual rating. So it's not the culmination of social network. And that's what I was trying to get at while we used the declaration of Dr. Shapiro in the various supplemental briefings. And that can be found, Your Honors, from the Match Appeal, the 1195, the appendix pages 70 to 71. And in the oath, which is the 1437, that would be the appendix pages 303 to 304. In the CORA, the 430 appeal, appendix pages 400 to 401. But we tried to establish the state of the art in 2003 and define what a social network is. So the social network itself adds to the patentability of these claims because social networks didn't exist at the time. Social networks allow so much more than the paper and pencil binder where you supply your own rating. And that's what I was trying to get at. And maybe if I could look at something a little bit more on the argument, I think we're not trying to say, Your Honor, and I think, Judge Chin, this might address exactly where you're going. We're not trying to say that we want to cover all. Matthew, users are looking for something who submitted a classification that matches a participant that's given back to them. We're limiting what we're searching for to those exact ratings, those exact rating systems. And if you go to the specification of the 107 patent, so from the 1195 appeal, reference to these pages, appendix page 0024, column 9, line 58 through column 10, line 38, the patent specification discusses how the improved rating systems are used for tracking the performance of the particular issue resolvers. And I won't read through the four different ways, but it covers ways for both the 591 patent and the 107 patent and other patents. So that's what we're claiming. We're claiming a specific way of establishing a social network with these enhanced rating systems. We're not trying to claim all classifications or matches of user-chosen classifications with participants. I would like to, I know I'm running out of time for my argument, the principle argument, so I'd like to get into two more quick issues if I can. This is Judge Toronto. Can I just ask you a question? Do you see any material difference between the two patents for eligibility purposes? Yes, sir. One, I don't see that the 591 patent has the term updating based on the responsiveness of the issue resolver to get back with the user. So that's definitely missing from that one. I'm sorry, let me try to be more precise. I understand that there is a claim difference, a slightly different focus. I don't think in your argument this morning yet you have identified, you have made an argument that that difference should translate into a difference in the eligibility conclusion. Yes, Your Honor. So I think the best way to do that is to go to our arguments concerning the district court's decision in the 1195 appeal. From that, we pointed out in our briefing that the district court summary, our focus of the case, completely read out the limitations displaying some of the information associated with each of the multiple participants is based on at least part of a rating of the individual participants. That wouldn't be present in the 591 patent. So we think they're very different. We think that based on that, the courts out of the Southern District of New York couldn't say that the collateral estoppel should apply between the two patents simply because it's missing that limitation, which adds a lot of granularity to the claims. And so there's no mention of rating at all in the court's granularity. So I was trying to kind of kill two birds with one stone there, Judge Serrano, addressing your question how it applies to why we think collateral estoppel can't apply between the claims of the 591 patent and the 107 patent. And I hope I did it okay. Excuse me, counsel. This is Judge Stoll. I just kind of want to follow up on that question and what you were talking about. And what I'm wondering is whether if I thought that the 591 patent claims were ineligible under 101, do you have an argument for why the 107 patent claims are eligible or vice versa? Yes, Your Honor. Thank you for letting me address that question. The 107 patent claims and the 591 patent claims are patentally distinct. In the timing of how long it takes the identified issue resolver to get back to the user, specifically in the claim language from the 107 patent, tracking of response time of each one or more participants who received the message from the user and then updating the rating is not found in the 591 patent. May I interrupt you for a minute? So you think maybe that's something that makes the claim eligible under Step 1 or Step 2 of ALICE, and how so? Yes, Your Honor. So when you couple that information with then going back up to what we call Element 5 in our claim construction analysis out of the match case, and it looks like I'm in my rebuttal time now. If I can continue quickly, Judge Stoll, I can answer the question. Our Element 5 out of the claim construction talks about displaying some of the information associated with each of those multiple participants based on that rating. We think it's that particular element that makes the 107 patent distinctive and patent-eligible subject matter. It's when you put all the elements together, that's the one that transforms it into something concrete. We're creating an enhanced social network. If you go to the 591 patent, it's the comparable element that we think transforms it into patent-eligible subject matter. It's tracking the feedback for each of the selected one or more participants based, at least in part, on the published portion of the response, including determining a rating from the user. So it's those elements independently in each patent that we assert make those patents patent-eligible subject matter. That's why, in our briefings, we put forward that some cases need claim construction to add granularity. Here, the claim construction was completely done, Your Honors. We had it all briefed. We had a hearing date scheduled. But the District Court and the Northern District of Texas did not issue a part of the construction of the terms, and we didn't have the hearing. We think this case is the one that should go through claim construction to fully define those terms. As Judge Bryson said, a lot of times you're going to learn a lot from that in the loyalty to conversion versus American Airlines case. And likewise, as Judge Reyna has said, that sometimes we need to go through that claim construction process to get at that granularity. Mr. Ramey, maybe it's time for us to hear from the other side so that you have some rebuttal time left. Thank you, Your Honor. Mr. Greeson, do I remember right that you are speaking first? Yes, Your Honor. May it please the Court, this is Robert Greeson with Northwest Fulbright USLLP. I'm here on behalf of Atele's Match Group, Humor Rainbow, and OkCupid. As Ms. Saunders mentioned earlier, the Atele's decided that I would speak for 10 minutes, focusing on the 107 patent. Mr. Moore, on behalf of Quora, will speak for seven minutes, focusing on the 591 patent. And Mr. Carter, on behalf of Oak, will speak for three minutes, focusing on the collateral estoppel issue. So, unless the Court has any initial questions, I'll begin by addressing the hypothetical that was posed by the Court earlier. I think it's certainly informative because it tracks very well with the hypothetical that's provided in the 107 patent itself. And this was also discussed by Mr. Ramey earlier. The point being that the novel rating system, pointed to by Mr. Ramey as being in the claims, is actually described as being something that is well understood and routine and traditionally performed by humans. And the specific example that's described at Column 10 is the notion that a corporation may rely upon its internal human resource department or other internal resources to relocate an employee and its family by identifying an appropriate moving company or the like for the family and then keeping track of the moving company's response time. And at Column 10, in lines 17 through 19, the specification clearly states that corporations typically have human resource departments or other internal relocation departments to facilitate the entire arduous process of relocation. And I think that's a very clear example that says that the entirety of what's set forth in the claims is something that was typically done by humans. The patent goes on to mention that the company can track responsiveness of a vendor that it hired so that the company will have knowledge of the vendor's responsiveness in the future. This, of course, does track the hypothetical posed earlier. And I would take it a step further that in the hypothetical that was posed, when the person making a recommendation for a realtor or the like when someone wants to move to Arlington, Virginia, that person making the recommendation is going to do so or going to recommend a realtor who they know is responsive or otherwise dependable. And people have been making those types of judgment calls since the beginning of humanity. Mr. Ramey acknowledged that at least under the hypothetical that it would be difficult to argue that that concept would be patent eligible. But that the claims no longer require a paper and pencil method. And I take that to mean that Mr. Ramey is arguing that because what was traditionally performed by humans is now implemented on a computer, there's a reasonable argument that the claims are patent eligible. But this court has held in several instances that merely implementing an activity or a process that's traditionally performed by humans on a computer, without more, will not confer patent eligibility. And on that point, I think it's also important to understand that the 107 patent makes clear that this was intended to be executed. That is, the process is contemplated by the 107 patent and the 591 patent, for that matter, were intended to be executed by generic computer architecture. There's absolutely no mention in the specification of anything that's unique. There's generic references to processors, memories, and servers. And that is certainly consistent with, for example, Claim 6 of the 107 patent that is generically directed to only a computer system. And I think that leads us to actually how the claims should be appropriately summarized or focused, or what the appropriate focus of the claims are. As the district courts recognized, the claims really set forth a process for presenting or displaying data, analyzing that data, and then displaying the results of the analysis. And again, this court has repeatedly held that those types of claims cannot confer patent eligibility. And so while Mr. Ramey argues that the claims are directed to an improved social network, I think that is an improper focus. We disagree on what the focus of the claims really is. For example, while Claim 1 recites in its preamble that it establishes a social network, we all know that the preamble without more is not limiting. And if we all look at what the claims truly set forth, what they really cover, it's no more than communicating generic information over a generic computer network. So I think the district courts got it right when they characterized the focus of the claims as something that's collecting information, analyzing it, and then displaying the results of the analysis. But setting that aside, even if Mr. Ramey's arguments were correct, that the claims were directed to a social network, that would not change the nature of the analysis. In other words, the claims would still be ineligible. Mr. Greeson, this is Judge Toronto. Just remind me. I may be confusing a little bit between the cases, but maybe not. Was there a proposed claim construction of social network? Not of a social network. There were proposed terms for construction. I do not believe that social network was at issue. But I can have that answer for you before this session is over for sure. But on the point of claim construction, I would point out that any claim construction here would not transform the nature of the claims. For example, while NETSOC argues that claim construction would perhaps change the nature of the claims, it's not true. For example, the claim features that NETSOC relies upon incorporate the term rating. Even under NETSOC's construction, the term rating is a measure of user feedback. In other words, a review or what one person says about another.  The terms that include rating, even under NETSOC's proposed construction, would be abstract under any circumstance. Second, we pointed this out in our briefing, but it's worth mentioning here, that several of the terms that NETSOC raises as needing construction for determination of eligibility are terms that NETSOC also argued that no construction is necessary or that they're entitled to their plain and ordinary meaning. And now that I've got the chart in front of me, I believe that social network was not put before the parties. Can you point me to the place in the joint appendix where I can find plaintiff's claim construction submission? Yes. I can point you to, first, the appellate's reply brief at pages 6 through 10. First of all, maybe I'm looking at the right thing. Is appendix 283 NETSOC's claim construction brief? It seems to be. Yes, Your Honor. Okay. And so in there, is there a proposed claim construction of social network? My recollection is that there is not. Okay. And I believe that's consistent with the chart that's presented in NETSOC's reply brief. Okay. Your time just ended. Why don't we hear now from Mr. Moore? Certainly. Thank you. Thank you. Thank you, Your Honors, and may it please the Court. The district court in the Northern District of California is one of three district courts that have correctly concluded that the 591 or 107 patents are invalid under this court's 101 precedent. And the district court in the Northern District of California has correctly concluded that on the merits of the 591 patent itself. First of all, dealing with step one of the ALICE test, the Northern District credited the plaintiff's assertion that the claims are directed to a social network. However, all the same, the court found that correctly to be an abstract concept. And so whether it is a social network or instead, as the district court found in MATCH, collecting, analyzing, displaying data, either way, the claims are directed to an abstract concept. Can I ask you the same question about this case and this patent that I asked Mr. Greeson about the 107 and the Texas case? Is there a proposed claim construction of social network proposed by NETSOC? And if so, where would I find it in the joint appendix? Your Honor, there was no proposed claim construction in the California case for the 591 patent. In fact, the plaintiff never argued at the Rule 12 stage, which is where this case was decided, that there should be claim construction relevant to the 101 issues. And there simply were no terms proposed for construction at all. Okay. And I know that the New York case is not your case. Is that same thing true in the New York case? Your Honor, I would have to defer to Mr. Carter for that. We were transferred. You'll have three minutes. Okay. Yes. I apologize. I know there was not a claim construction order, but whether they got into disclosing claim terms, I believe we were transferred to California by the time that would have happened, if it did happen at all. So, in our case, and this highlights some of the, well, we certainly think, first of all, that the district court in Texas reached the right decision as to the 107 patent, and that there is collateral estoppel, which is our ultimate grounds. But the district court in California is also correct on its independent 101 analysis. And there's really a few reasons, in addition to those set forth by the court in Texas, why that's true. I already mentioned one of them, which is that not even the plaintiff argued that claim construction is relevant to the 101 issues on the 591 patent. It was never raised in the motion-to-dismiss briefing. In fact, they didn't even raise claim construction until their grade brief in this appeal. There's no dispute before this court in the plaintiff's briefing as to representative claims of the 591 patent. And, in addition, there's been some discussion in the appellant's argument about the Shapiro declaration. That was not part of the California case. It was not part of the complaint that was submitted, and that was the subject of the Rule 12 motion. The plaintiff did seek to amend the complaint, but the district court correctly denied that because all the amendment did was cite to And lastly, to the extent it relied on the expert declaration, that declaration discusses the rating and feedback system in the 107 patent and not in the 591 patent at issue in California. And that's the last point of difference, really, is that there's a lot of discussion in the plaintiff's, in the appellant's argument about feedback and ratings, and really there is much less detail in the claims of the 591 patent in terms of feedback and ratings. The ratings are not determined based on tracked response time. There is simply a disclosure and a claim of tracking feedback based, at least in part, on the published portion of the response, and then determining a rating from the user for at least one of the selected one or more participants. So there is no discussion at all about how that feedback is tracked, what basis it's tracked on, nor how any rating from the user for any of these participants is determined. It's simply claiming any system that involves tracking feedback and determining ratings. Very broad and quite an abstract concept. No granularity to that claim at all. And so, in summary, we believe that the district court in California correctly reached an independent decision as to the 591 patent's ineligibility. But that also, because of the ineligibility decision of the Texas court in the collateral estoppel, that judgment would be properly affirmed on behalf of CORA from the California case as well. And unless your honors have any additional questions for me, I'm happy to cede the rest of my time to Mr. Carter. Hearing no questions, but Mr. Carter, you have three minutes. We're not going to do ceding of time, so you can start your three minutes. Well, thank you, your honors. May it please the court, Ralph Carter on behalf of Defendant Appolio. Just at the outset, I would note that it's not clear whether NEDSOC has addressed the collateral estoppel point in his argument in chief, but if the court would like for me to proceed. You can use your time any way you like. Well, thank you, your honor. The court has already had the benefit of the arguments from Matt on the 107 patent and CORA on the related 591 patent. So this court can affirm Judge Abrams' decision in the oath case on either of the following bases. First, if the court agrees that the 591 patent is invalid, then this case would end. Second, if the court agrees with Judge Godbee that the 107 patent is invalid, then NEDSOC is collateral estoppel from bringing its claims. NEDSOC does not dispute the only issue really before the court on this appeal is whether the two patents are substantially similar. In light of NEDSOC's admissions that the two patents were, quote, the judge Abrams reached the correct decision that both patents and substance claim inventions of the same method of connecting users to facilitate resolving life issues. Now, in our case, NEDSOC initially alleged infringement of the 107 patent. Oath moved to dismiss that as invalid under 101. Then, in the oath case, Judge Abrams issued a stay of discovery holding that the oath and the other consolidated defendants raised substantial arguments in favor of dismissal. Then, when faced with the prospect that Judge Abrams would find the 107 patent invalid, NEDSOC shifted gears and swapped in the related 591 patent without filing a second amendment and filed a second amendment complaint without leaving court. Notably, NEDSOC made no other changes from its first amendment complaint. It just merely replaced 107 with 591. In order to convince Judge Abrams to allow NEDSOC to proceed with its claim under 591, NEDSOC represented that the two patents were, as we stated earlier, highly related and that there was extreme similarity in the independent claim one as between the 107 and 591 patents. NEDSOC also claimed that claims, constructions, proceedings would not be affected because the two patents were so similar. On that basis, Judge Abrams permitted NEDSOC to proceed and heard briefing on the collateral estoppel issue in the oath case. Notably, NEDSOC did not oppose collateral estoppel in substance. It merely said that Judge Abrams' decision on collateral estoppel should... If you'd like for me to finish my point there, I'm happy to do so, Your Honor. Very briefly, please. Yes. NEDSOC merely argued that the determination of collateral estoppel should wait until the match group motion for new trial was determined, and that was done on October 23rd, 2019, which mooted the only basis that they opposed collateral estoppel. Additionally, as we note in our papers, NEDSOC should be judicially stopped from raising these arguments. It waived them below, and also it received the benefit of being able to proceed with the Second Amendment complaint. I think you've now moved on to a different point from completing the one that you were completing, so I think we'll shift to Mr. Ramey's rebuttal with whatever time he has left. Thank you, Your Honor. Thank you. And thank you, Your Honor. This is Bill Ramey, if I may continue. Just to address briefly the arguments from all the defendants, it's important to remember that the cases were all consolidated in the Southern District of New York for a period of time when the motion to dismiss came out from the Northern District of Texas, and briefing for claim construction was made in the oral hearings, but it isn't part of the record before this court, and so I just wanted to point out to say that, but the Markman hearing was made, the court in the Southern District of New York was made aware of it. It just, unfortunately, the way the case progressed wasn't started or wasn't begun in this court. And is it right that you never proposed the claim construction of the term social network? Social network was, no, yes, Your Honor, we never proposed the construction of the term social network because we felt that the entire claim was claiming that social network. And that's, if I may, Your Honor, thank you for bringing that out. You had a, I wanted to address something that we talked about a little bit before, the paper three-ring binder example that we gave. The 107 patent, at least, is a patent with, so going back to Judge Sins, I was specifically referring to the claims of the 107 patent and how those claims, the claims of that particular patent claim a radio system that's applied in an unconventional manner to a social network that allows the inquiry message to be sent from a user directly to the participants while she's in the contact information of the user from the participants. And that, we would contend, is also unconventional, at least in 2003. And then I had left, and I'm not sure if y'all heard this, going into the other inventive aspects of the patents, and that's, and I think this is where I was disconnected, and I apologize. But I did want to briefly get back to, this is element of step two, if it's necessary to get there, about other inventive aspects. And I'll refer to the appendix at page 28 from the 1195 appeal at page 108, column 7, lines 18 through 24, for a description of how the rating works for the 107 patent. And the specifications are common for all the patents, but it's just not the page, the line numbers are sometimes different. But the same information is there. And then I wanted to get into a specific example that's claimed, that's described in the specification, that being appendix page 109 at column 10, lines 11 through 55, that being... And if I may finish... Just finish this, yeah, finish this point without changing points, unless you get a question, please. Yes, Ron, and that further assimilation of communities addressed in that part. And then lastly, those, finishing that point, these are claims, and the claims of the 107 patent at appendix page 28 at column 18, lines 5 through 38, where it's talked about shielding the contact information, displaying some of the information. Some of this, this is in our briefing, but I wanted to point out that this, these are the other inventive aspects that we think with the tracking and rating has been disclosed as well at appendix page 24, column 9, line 58 through column 10, line 10. And with that, I'll end my argument. Thank you very much. Thank you, Mr. Ramey, Mr. Greyson Moore-Carter. The cases are submitted, and we will conclude our argument session for the morning. The Honorable Court is adjourned until tomorrow morning at 10 a.m.